

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BOLLORÉ, S.A., et. al, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | CIVIL ACTION NO. 3:99-CV-1196-R |
| IMPORT WAREHOUSE, INC., et. al., | § § § | |
| *Defendants.* | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Now before this Court is Bolloré, S.A. ("Bolloré"), North Atlantic Operating Company, and North Atlantic Trading Company's (collectively, "Plaintiffs") Motion for Contempt Against Ravi Bhatia and Import Warehouse, Inc. ("Defendants") (filed February 7, 2002). Plaintiffs allege that Defendants should be held in contempt of this Court's Agreed Final Judgment and Permanent Injunction (entered April 7, 2000) (the "Injunction"). On April 10, 2002, this Court held a contempt hearing in this matter (the "First Hearing"). Subsequently, this Court granted a motion to reopen the contempt hearing, and two additional contempt hearings were held, on August 1, 2002, and January 22, 2003 (respectively, the "Second Hearing" and the "Third Hearing").

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, this Court makes the following findings of fact and conclusions of law:

## I. FINDINGS OF FACT

A.  **BACKGROUND**

1.  Bolloré is a French corporation which, *inter alia*, manufactures and sells cigarette papers under the "Zig-Zag" brand name. Among the products sold by Plaintiff under the Zig-Zag brand name are Zig-Zag Orange ("Orange") and Zig-Zag White ("White") cigarette papers.

2.  Bolloré owns registered trademarks relating to its Zig-Zag line of cigarette papers.

3.  North Atlantic Operating Company ("NAOC") and National Tobacco Company ("NTC") are subsidiaries of North Atlantic Trading Company ("NATC").

4.  NAOC has an exclusive license from Bolloré to import and distribute Zig-Zag cigarette papers within the United States.

5. Both Orange and White are packaged into cases for sale. Each case contains 25 boxes (also called cartons). Each box in turn contains 24 booklets of cigarette papers.

6. Defendant Ravi Bhatia ("Bhatia") is the president and owner of Ravi's Import Warehouse, Inc. (d/b/a Import Warehouse, Inc.) ("Import Warehouse"), which is a wholesaler of a wide variety of products including Orange and White. Import Warehouse is located at 1311 Harry Hines Boulevard in Dallas, Texas.

7. Under the terms of the Injunction, Defendants were permanently enjoined from, *inter alia*, selling, attempting to sell or assisting others to sell as Bolloré products, products which were not Bolloré's or not imported or distributed under the control of Bolloré or NAOC; diluting any Zig-Zag trademarks; and, importing or distributing any products bearing Zig-Zag trademarks which were not authorized by Bolloré for sale in the U.S.[1] Bhatia and Import Warehouse are each signatories to the Injunction.

**B.   ALLEGED VIOLATIONS OF THE INJUNCTION**

### International Foods

8. On April 12, 2002, Tim Fournier ("Fournier"), a regional sales manager for NTC, and one of his colleagues, Alan Newman ("Newman"), visited International Foods, located at 3940 Barron Street in Metairie, Louisiana.

9. At International Foods, Fournier and Newman spoke with Mihir Shah. Mihir Shah and his cousin, Hiren Shah, are both employees of International Foods.

10. After receiving permission from Mihir Shah, Fournier examined the inventory of Zig-Zag products at International Foods and found an open case of Orange which contained eight boxes of counterfeit Orange and eight boxes of legitimate Orange. Behind this case, Fournier found an unopened case of Orange which was entirely counterfeit.

11. Upon learning that Fournier had discovered counterfeit product, Mihir Shah phoned his cousin, Hiren Shah.

12. In response to Fournier's inquiry regarding the source of the counterfeit Orange, Mihir Shah gave Fournier an invoice from Import Warehouse. The invoice, dated March 21, 2002, lists, among other items, the purchase of 500 boxes (equal to 25 cases) of Orange from Import Warehouse by International Foods.[2]

---

[1] *Injunction*, at 3. The relevant provisions of the Injunction are excerpted *infra* at Conclusions of Law, ¶7.

[2] *Plaintiff's Ex 32*.

13. Mihir Shah stated to Fournier that the invoice reflected the then current inventory of Orange held by International Foods.

14. During the Second Hearing, Fournier testified to the facts relating to his visit to International Foods. This Court finds the testimony of Fournier regarding his visit to International Foods to be highly credible.

15. Fournier has also submitted a sworn declaration (dated May 17, 2002) which recounts, in less detail, his visit to International Foods.[3] This Court does not find Defendants' attempts to point out inconsistencies between Fournier's declaration and his live testimony to be of significant evidentiary value or to lessen the credibility of Fournier's in-court testimony.

16. During his video-taped deposition, Hiren Shah, stated that he directed Mihir Shah, to give the Import Warehouse invoice to Fournier, as this was the most recent invoice reflecting the current inventory of Orange. Hiren Shah also stated that he told Fournier that the counterfeit Orange was from Import Warehouse.

17. Shortly after Fournier and Newman left International Foods, Mihir Shah telephoned Bhatia. During the Second Hearing, Bhatia testified regarding this phone call. He stated that Mihir Shah recounted to him that counterfeit product had been found by Fournier, that Mihir Shah had given Fournier the Import Warehouse invoice, and that Mihir Shah did not mention a return or jobber as a possible alternate source of the counterfeit Orange. Upon further questioning, Bhatia stated that he did not know why Mihir Shah telephoned him immediately after Fournier left International Foods. Bhatia also denied selling International Foods any counterfeit Zig-Zag products.

18. This Court finds Bhatia's denial of Import Warehouse's sale of counterfeit goods to International Foods to not be credible. Bhatia's testimony is discredited to the extent it conflicts with the live testimony and physical evidence introduced by Fournier.

19. This Court also discounts any statements made by Hiren Shah in his deposition regarding other possible sources for the counterfeit Orange product – i.e. a jobber or a return. Such statements are inconsistent with the in-court testimony of Fournier and other statements made by Hiren Shah in his deposition.

20. This Court finds, by clear and convincing evidence, that Import Warehouse had sold the counterfeit Zig-Zag product discovered by Fournier during his visit to International Foods.

---

[3] *Defendant's Ex 10.*

## International Foods Retail

21.  After leaving International Foods, Fournier visited an International Foods retail store ("International Foods Retail") located on Georgia Street in Kenner, Louisiana. At International Foods Retail, Fournier discovered eleven boxes and twelve booklets of counterfeit Orange.

22.  Although International Foods Retail appears to be part of a network of family businesses which includes International Foods, International Foods Retail did not source its goods exclusively from International Foods.

23.  Plaintiffs have not produced an invoice, or other documentary evidence, directly linking the counterfeit Orange found at International Foods Retail to Defendants.

24.  This Court finds the evidence suggesting a link between the counterfeit Orange found at International Foods Retail and Defendants to be insufficient to meet the clear and convincing standard required in this civil contempt proceeding.

## A&D Enterprises

25.  On August 31, 2001, Casey Cooper ("Cooper"), director of national accounts for NTC, and Tom Houston, an investigator working for Plaintiffs, visited A&D Enterprises ("A&D"), a wholesaler located in Columbus, Ohio.

26.  After receiving permission from the owner of A&D, Diab Ellan ("Ellan"), to examine A&D's inventory of Zig-Zag products, Cooper discovered 16 boxes of counterfeit White.

27.  Cooper then checked the inventory in the back portion of A&D and located a pallet on which were three cases of counterfeit White. The pallet was partially enclosed by shrink wrap, and affixed to the shrink wrap was a shipping label from Import Warehouse to A&D.[4]

28.  Ellan gave Cooper copies of invoices relating to A&D's recent purchases from Import Warehouse.

29.  Subsequently, on or about January 18, 2002, Cooper again visited A&D in order to request that Ellan sign a declaration regarding Cooper's prior visit to A&D and the counterfeit White found at that time. Ellan signed the declaration.[5]

30.  This Court finds Cooper's testimony during the first hearing regarding his visits to A&D to be highly credible.

---

[4]*Plaintiff's Ex 13*, at 3.

[5]*Plaintiff's Ex 17*.

31.     During the First Hearing, Ellan testified regarding Cooper's visits to A&D. Ellan testified that he did not know that the declaration was a legal document and he had not read it prior to signing it; instead, he claimed to have signed it because he knows and trusts Cooper.

32.     Ellan also testified that the counterfeit White found by Cooper was "on the pallet or next to the pallet" and that it was from "Ravi [Bhatia] or others." Ellan further stated that he was "not sure" as to the source of the counterfeit White, and offered up various possible theories for why the source was not Defendants, including other wholesalers such as Abassi Wholesale or a return from Ahmad Niqrish.

33.     This Court finds Ellan's testimony regarding his failure to read the declaration and other possible sources of the counterfeit White found at A&D to be of low credibility. This Court discredits Ellan's testimony to the extent it differs from that of Cooper.

34.     This Court also discredits the denials made by Bhatia, during both the First and Second Hearings, regarding the sale by Import Warehouse of the counterfeit White found at A&D.

35.     This Court finds, by clear and convincing evidence, that Import Warehouse sold the counterfeit Zig-Zag product discovered by Cooper during his visit to A&D.

**Star Wholesale**

36.     In early October 2001, Clark Sturdivant ("Sturdivant"), a regional manager for NTC, and a colleague, Michael Leroy ("Leroy"), visited Star Wholesale located on Marvin Drive in Houston, Texas.

37.     After introducing themselves to Tony Ali ("Ali"), the principal of Star Wholesale, Sturdivant and Leroy proceeded to conduct a check of Star Wholesale's inventory of Zig-Zag products. Upon examining the inventory, Sturdivant discovered approximately six cases of counterfeit White. Sturdivant and Leroy then exchanged a case of legitimate White which they had brought with them for one of the cases of counterfeit White and instructed Ali to segregate the other five cases of counterfeit product from the rest of his inventory.

38.     Ali gave Sturdivant copies of invoices detailing sales of White by Import Warehouse to Star Wholesale.

39.     Subsequently, Leroy again visited Star Wholesale in order to pick up the other five cases of counterfeit White. When he returned to Star Wholesale, he observed someone switching legitimate product for the counterfeit White, and was unable to obtain the five additional cases of counterfeit White. Instead, he was twice asked to leave, and did so. When he returned several hours later, the product had been switched and rather than the five cases of counterfeit White, he was given five cases of legitimate White.

40.     Ali, in his deposition, stated that he told Sturdivant that the counterfeit White found at Star Wholesale was from Import Warehouse. Ali stated that he believed the counterfeit White was most likely from an invoice from Import Warehouse dated September 12, 2001. Ali also stated that he spoke to Bhatia about the counterfeit White, and that Bhatia denied that the goods were counterfeit. Bhatia did not, however, deny that he sold Ali the goods.

41.     Bhatia, during the First Hearing, testified that he had spoken with Ali about the counterfeit White found at Star Wholesale. Bhatia denied that Import Wholesale had sold counterfeit White to Star Wholesale, stating that either the product was not counterfeit or it had not been sold by Import Warehouse.

42.     This Court finds the testimony of Sturdivant and Leroy regarding their visits to Star Wholesale to be highly credible.

43.     This Court finds the testimony of Bhatia denying that Import Warehouse is the source of the counterfeit White found at Star Wholesale to not be credible, and it is discredited to the extent it conflicts with these findings.

44.     This Court finds, by clear and convincing evidence, that Import Warehouse had sold the counterfeit Zig-Zag product discovered by Sturdivant and Leroy during their visit to Star Wholesale.

### **Texas Wholesale**

45.     In late September 2001, Sturdivant, accompanied by a colleague, Mark Spivey ("Spivey"), visited Texas Wholesale, a wholesaler located at 11409 Denton Drive in Dallas, Texas.

46.     While examining the inventory of Texas Wholesale, Sturdivant and Spivey found and purchased a case of counterfeit Orange.

47.     Based on a conversation with Mohammed H. Wazirali ("Wazirali"), the vice-president of Texas Wholesale, Sturdivant concluded that the counterfeit Orange had been purchased by Texas Wholesale from Starco Impex (a/k/a Wholesale Outlet), a wholesaler located in Beaumont, Texas.

48.     Wazirali, during his deposition, stated that the counterfeit product which Sturdivant found had been purchased from Starco Impex.

49.     The president of Starco Impex, Muhamed Tahir Javed ("Javed"), submitted an affidavit to this Court wherein he states that the counterfeit product which he sold to Texas Wholesale had been purchased from Import Warehouse.

50.     This Court finds the testimony of Sturdivant regarding his visit to Texas Wholesale to be credible. However, the evidence, specifically linking Import Warehouse to Starco Impex consists of documents provided by individuals, Wazirali and Javed, whose credibility this Court has not been

able to judge through live testimony.

51.     Therefore, this Court finds that Plaintiffs have failed to establish by clear and convincing evidence that Defendants sold or distributed the counterfeit Zig-Zag product found at Texas Wholesale.

### Buyer's Wholesale

52.     During the First Hearing, Cooper also testified that, on several occasions, he had visited Buyer's Wholesale, located in Indianapolis, Indiana.

53.     While on one of his visits to Buyer's Wholesale, Cooper discovered ten cases of counterfeit Orange. On the top of the box containing the ten cases of counterfeit Orange was a shipping label showing that the product had originated at J&S Distributors in Louisville, Kentucky.

54.     The president of Starco Impex, Muhamed Tahir Javed ("Javed"), submitted an affidavit to this Court wherein he states that the counterfeit product which he sold to J&S had been purchased from Import Warehouse. In addition, Jeff Guernsey, the owner of J&S Distributors, was deposed by Plaintiffs.

55.     Although this Court views the testimony of Cooper regarding his visits to Buyer's Wholesale as credible, it is of the opinion that the evidence linking Import Warehouse to the counterfeit product found at Texas Wholesale, like that discussed *supra* for Texas Wholesale, is rather attenuated.

56.     Therefore, this Court finds that Plaintiffs have failed to establish by clear and convincing evidence that Defendants sold or distributed the counterfeit Zig-Zag product found at Buyer's Wholesale.

### S.A. Discount

57.     On April 10, 2002, Tony Yensen ("Yensen"), at that time a regional manager of NTC, visited S.A. Discount, a wholesaler located in Berlin, Connecticut. While at S.A. Discount, Yensen spoke with Adnan Kashi ("Kashi"), an employee of S.A. Discount.

58.     At S.A. Discount, Yensen discovered a box of gray market White. This box of "Syrian" White was manufactured and authorized for sale in Syria; its import into the United States had not been authorized by Bolloré, NAOC, or NATC.

59.     After he inquired regarding the source of the Syrian White, Yensen was given an invoice from Import Warehouse dated February 21, 2002.[6]

---

[6] *Plaintiffs' Ex 37*

60.     Subsequently, Mark Roussell ("Roussell"), a private investigator hired by Plaintiffs, and John Bosco, a colleague of Roussell's who speaks Hindi, again visited S.A. Discount in order to obtain a signed declaration regarding the Syrian White. Mohammad Aslam ("Aslam"), who is the owner of S.A. Discount and Kashi's brother, signed the declaration. In addition, Aslam's daughter (Aqsa Aslam) and both investigators also signed the declaration.[7]

61.     This Court finds the testimony of Yensen and Roussell at the Second Hearing regarding their visits to S.A. Discount to be highly credible.

62.     At the Second Hearing the parties were granted leave to conduct additional depositions. After the Second Hearing, both Kashi and Aslam were deposed.

63.     In his deposition, Kashi stated that the box of Syrian White was from a shipment from Import Warehouse which had been received a few days prior to Yensen's visit. Aslam, in his deposition, stated that he signed the declaration because Kashi had told him "everything" about Yensen's visit. Aslam also stated that his daughter had read the declaration to him before he signed it. Aslam further stated that he told Bhatia by phone that Import Warehouse had sold S.A. Discount the unauthorized Syrian White.

64.     Bhatia testified that he believes Aslam lied in his declaration, and that he does not know why Aslam would make such statements.

65.     This Court finds Bhatia's statements regarding the Syrian White found at S.A. Discount to be wholly without credibility.

C.     **OTHER EVIDENCE**

66.     James Babbish ("Babbish"), a private investigator hired by Plaintiffs, testified during the First Hearing regarding a meeting he had with Adham Makki and Tarek Makki on April 4, 2002.

67.     While the Court finds Babbish a reasonably credible witness, it does not view either Adham Makki or Tarek Makki to be credible sources. Therefore, this Court finds that testimony regarding statements allegedly made by either Adham or Tarek Makki lacks significant evidentiary value in this proceeding.

68.     This Court finds the summaries of purchases and sales invoices produced by Defendants, and the testimony offered by Bhatia pertaining thereto, inconclusive and unpersuasive as such summaries were prepared for the purposes of this litigation and do not include actual invoices or contain other guarantees of their comprehensiveness or accuracy.

---

[7]*Plaintiffs' Ex. 36.*

69.    If any of the foregoing Findings of Fact may be more properly deemed Conclusions of Law, they are hereby incorporated by reference into the Conclusions of Law.

## II. CONCLUSIONS OF LAW

1.    Federal courts "possess the inherent authority to enforce their own injunctive decrees." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (citing *Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985)).

2.    "A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Travelhost*, 68 F.3d at 961 (citing *SEC v. First Financial Group of Tx., Inc.*, 659 F.2d 660, 669 (5th Cir. 1981)). Plaintiffs seek to hold Defendants in civil contempt for violation of the Injunction.

3.    In order to prevail in this civil contempt proceeding, Plaintiffs must satisfy a three part test. Plaintiffs must establish: "by clear and convincing evidence: 1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *American Airlines, Inc. v. Allied Pilots Assoc.*, 228 F.3d 574, 581 (5th Cir. 2000) (quoting *Petroleas Mexicanos v. Crawford Enterprises, Inc.*, 826 F.2d 392, 401 (5th Cir. 1987)).

4.    Clear and convincing evidence, in a contempt proceeding, is evidence which "produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts" at issue. *Travelhost*, 68 F.3d at 961 (quoting *Cruzan by Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 285 n.11 (1990)). The weight of evidence required is "higher than the 'preponderance of the evidence' standard, common in civil cases, but not as high as 'beyond reasonable doubt.'" *Travelhost*, 68 F.3d at 961 (citing *U.S. v. Rizzo*, 539 F.2d 458, 465 (5th Cir. 1976)).

5.    This Court entered the Injunction on April 7, 2000, and it has remained in full force and effect since that date. Therefore, Plaintiffs have satisfied the first prong of the three part test by clear and convincing evidence.

6.    Both Bhatia and Import Warehouse were signatories to the Injunction. Hence there is no issue of lack of notice or failure to be bound by the terms of the Injunction. Defendants have also not raised the defense of inability to comply with the terms of the Injunction.

7.  The Injunction, in relevant part, permanently enjoined Defendants from:

> Selling or passing off or inducing or enabling others to sell or pass off, as and for any of Bolloré's products, or as and for products produced by Bolloré, any product not Bolloré's, or not produced, imported or distributed under the control or supervision of Bolloré and/or its U.S. distributor, North Atlantic Operating Company, Inc. ("NAOC"), and approved for sale under Bolloré's ZIG-ZAG Trademarks, copyrighted Designs, or any of them, by Bolloré; . . .
>
> Diluting and infringing the ZIG-ZAG Trademarks, or any of them, and damaging their good will; . . .
>
> Importing, shipping, delivering, distributing, returning or otherwise disposing of, in any other manner, products or inventory not authorized by Bolloré to be sold, or offered for sale, in the U.S. and which bear the ZIG-ZAG Trademarks, copyrighted Designs, or any of them; . . . [and]
>
> Attempting causing or assisting any of the above-described acts. [8]

8.  The Injunction speaks with precision regarding the types of conduct which are barred. Defendants were required to refrain from certain conduct, which included selling or assisting others to sell products which were not authorized by Bolloré as if such products were so authorized. Thus, the Injunction, by clear and convincing evidence, satisfies the second prong of the three-part test.

9.  Plaintiffs have also satisfied the final part of the three part test, namely, establishing by clear and convincing evidence that Defendants have failed to comply with the terms of the Injunction, with respect to the counterfeit Bolloré Zig-Zag products discovered at the following three entities: International Foods, A&D Enterprises, and Star Wholesale.

10. This Court finds that Plaintiffs have acted willfully in violating the Injunction with respect to International Foods, A&D Enterprises, and Star Wholesale.

11. After considering the voluminous hearing and documentary evidence adduced in this proceeding, this Court holds:

   (a)  Defendants in contempt of the Injunction for the sale of counterfeit Bolloré Zig-Zag products to International Foods. *See Findings of Fact*, ¶¶ 8-20;

   (b)  Defendants in contempt of the Injunction for the sale of counterfeit Bolloré Zig-Zag products to A&D Enterprises. *See Findings of Fact*, ¶¶ 25-35; and

---

[8] *Injunction*, at 3 (terms capitalized in the original).

  (c) Defendants in contempt of the Injunction for the sale of counterfeit Bolloré Zig-Zag products to Star Wholesale. *See Findings of Fact*, ¶¶ 36-44.

12. Plaintiffs have failed to establish by clear and convincing evidence that Defendants have violated the Injunction with respect to International Foods Retail, Texas Wholesale, and Buyer's Wholesale. *See Findings of Fact*, ¶¶ 21-24, 45-56.

13. This Court rejects Defendants' objections over the admissibility of certain evidence in this proceeding. The Court considered Defendants' evidentiary objections at each point they were raised during the three contempt hearings and sees no need to revisit any of its prior evidentiary rulings. The Court does note, however, that Plaintiff has met its burden of establishing contempt with respect to International Foods, A&D Enterprises, and Star Wholesale *irrespective* of the admissibility of any alleged hearsay evidence.

14. After citing a party for civil contempt, a federal district court has broad latitude to determine an appropriate remedy. "The sanctions imposed after a finding of civil contempt serve two functions: to coerce future compliance and to remedy past noncompliance." *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979) (citing *U.S. v. United Mine Workers*, 330 U.S. 258, 302-04 (1947) and *Sunbeam Corp. v. Golden Rule Appliance Co.*, 252 F.2d 467 (2d Cir. 1958)). *See also Whittaker Corp. v. Execuair Corp*, 953 F.2d 510, 517 (9th Cir. 1992).

15. Plaintiffs are entitled to profits lost due to Defendants contumacious conduct and to reasonable attorney's fees and expenses incurred in this contempt proceeding. By separate Order, this Court shall specify a briefing schedule to allow the parties to be heard on the issue of calculation of damages.

16. If any of the foregoing Conclusions of Law may be more properly deemed Findings of Fact, they are hereby incorporated by reference into the Findings of Fact.

## III. CONCLUSION

Based on the foregoing Findings of Fact and Conclusions of Law, Plaintiffs Motion for Contempt Against Ravi Bhatia and Import Warehouse, Inc. is hereby **GRANTED**. Defendants are hereby held in contempt of this Court's Agreed Judgment and Final Injunction of April 7, 2000. After briefing by the Parties, Damages shall be assessed by separate Order of this Court.

It is so **ORDERED**.

Signed: June 27, 2003.

JUDGE JERRY BUCHMEYER
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS